IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. JARED MICHAEL CHRISTEIN

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S42,732     Phyllis H. Miller, Judge**

---

**No. E2001-01856-CCA-R3-CD**
**March 4, 2003**

---

The appellant, Jared Michael Christein, was convicted by a jury in the Sullivan County Criminal Court of second degree murder, felony murder, and especially aggravated robbery. The appellant's second degree murder conviction was merged into his felony murder conviction and he was sentenced to life imprisonment in the Tennessee Department of Correction. The trial court also sentenced the appellant to twenty-five years incarceration for the especially aggravated robbery conviction. On appeal, the appellant raises the following issues for our review: whether sufficient evidence existed to support his convictions and whether the trial court properly charged the jury on the appropriate lesser-included offenses. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. GARY R. WADE, P.J., concurring in results only.

Mark D. Slagle, Johnson City, Tennessee, for the appellant, Jared Michael Christein.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Doug Godbee, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

The Sullivan County Criminal grand jury returned a presentment charging the appellant with one count of first degree premeditated murder, one count of felony murder, and one count of especially aggravated robbery. At trial, the State first called Lieutenant Jack Necessary, a detective with the Bristol Police Department. Lieutenant Necessary testified that, on the morning of April 5, 1999, he was jogging in Steele's Creek Park. As he was completing his run, Lieutenant Necessary was interrupted by Rocky Smith, who informed Lieutenant Necessary that there was a

body lying beside the creek. Lieutenant Necessary examined the body, noticing "numerous amounts of blood." Upon confirming that the victim was deceased, he contacted the Detective Division and gave them instructions on how to proceed. The victim was later identified as David B. Vestal.

In the course of his investigation, Lieutenant Necessary spoke with the appellant's co-defendant, Daniel Wade Wilson, on April 5, 1999, at approximately 4:00 p.m.[1] At the time of the conversation, Wilson was in possession of a knife enclosed in a sheath and he had recent scratches on his left hand. When Lieutenant Necessary mentioned Steele's Creek Park, Wilson began to "shu[dd]er and to shake and tense up." As the result of a consensual search of Wilson's mobile home, police obtained the clothing Wilson wore on the night of the offense. Lieutenant Necessary observed that the shirt and pants obtained by the police were covered with blood and dirt.

Detective Charles Thomas, also with the Bristol Police Department, testified that he was called to the scene of the crime by Lieutenant Necessary on April 5, 1999. Detective Thomas noted that Steele's Creek Park was open to the public, normally between the hours of 8:00 a.m. and 10:00 p.m. The police examining the scene discovered cigarette butts, a Skoal can, and two bottles of Busch beer, one of which was full and the other was partially empty. The partially empty beer bottle had blood on it. Detective Thomas also observed a lengthy blood trail, approximately two hundred (200) yards long, extending between the body and a large puddle of blood. Additionally, the scene revealed evidence of a fight. Notably, there was also blood on nearby trees.

At approximately 1:30 or 2:00 p.m. on April 5, 1999, Detective Thomas first made contact with the appellant. Detective Thomas noted that the appellant's right hand was swollen and slightly bruised. After being advised of his Miranda rights, the appellant made a voluntary statement. Initially, the appellant denied that he had ever been to Steele's Creek Park; however, he soon began to reveal his part in the murder and robbery. Following a request from Detective Thomas, the appellant provided a handwritten statement disclosing his role in the offenses. Later, Detective Thomas also took a typewritten statement from the appellant.

In his statements, the appellant confessed that, on the morning of April 5, 1999,[2] he and Brandon Alford were at Alford's mobile home when Wilson came to the mobile home. The three men began drinking and smoking marijuana. Around 7:00 p.m., Alford's girlfriend, "Sissy," drove the trio to Big Creek and left them there. She did not return to drive the men home. At approximately 2:30 a.m., "some people that [Alford] knew," namely Kim Bolling and Vestal, drove by and the three men asked them for a ride home. Bolling and Vestal agreed and the men got into the back seat of the vehicle. Vestal, who was driving, had been drinking and was driving "very recklessly and fast," running the vehicle off the road on one occasion. The passengers became

---

[1] Wilson was tried for these offenses in a separate proceeding.

[2] From the record, it is clear that the men gathered on April 4, 1999, with the events continuing into the early morning hours of April 5, 1999. Vestal's body was discovered later on the morning of April 5.

annoyed with Vestal's careless driving. Eventually, Bolling pulled the keys from the ignition and insisted that she drive.

According to the appellant's statement, all five people proceeded to Lakeview Dock. They had originally planned to steal a boat, but later decided against it. While at the dock, they smoked a "bowl" of marijuana. Bolling then drove the group to a BP service station and Vestal went inside the store. While Vestal was inside the store, the appellant, Wilson, and Alford "started talking about 'ganking' the guy." The appellant explained, "[w]e were going to kick the guy's ass and take his money because he was being such a redneck. It was my idea but we all talked about it."

The appellant related that as they were leaving the BP, he informed Vestal that he was supposed to meet someone at Steele's Creek Park to obtain marijuana and he would give Vestal and Bolling "a ½ nickle" if they would drive him to the park. Alford "got scared" and asked to be left at the trailer park. After leaving Alford at the trailer park, the remaining four people proceeded to Steele's Creek Park. Bolling stayed in the vehicle while the appellant, Wilson, and Vestal got out of the vehicle and walked into the park. The appellant acknowledged, "I intended to take the guy['s] money because he was being such a redneck." At Vestal's request, the appellant attempted to "spark up a bowl," but Vestal "kept getting redneck with me." The appellant stated:

> [Vestal] told me that he was from Hickory Tree and he could whip my ass anytime and anyday. I said "f[---] you" and he called me a motherf[-----] so I hit him with my right hand over his right eye. He went down into kind of a crouch position and I went down on his back with my elbow and grabbed his wallet and stuck it in my pocket. As the guy was getting back up I heard [Wilson's] knife click open. As the guy was standing up I was kind of between him and [Wilson]. [Wilson] was coming at him with the knife. The guy tried to duck behind me but I moved and I think [Wilson] stabbed him up high in the neck near his face. . . . The guy kind of staggered and took of[f] running. I freaked out and turned my back to [Wilson] and the guy. I lit a cigarette, and as I was doing that I heard the guy call [Wilson] a redneck son-of-a-b[----] or something like that and then I heard a thump and gravels moving. I thought the guy might have [Wilson] down so I went to get his back. I saw that the guy was on the ground and [Wilson] was on top of him. I heard the guy say something like "what are you trying to do, kill me?". . . When I got up to where [Wilson] and the guy were I saw that the guy was still breathing. I grabbed his feet and [Wilson] grabbed his hands and we threw him into the lake. Then we took off. We made it to the bridge and [Wilson] said we ought to go back and see if the guy was dead. I said "f[---] it" and we kept running.

The appellant continued his recitation, explaining that he and Wilson then returned on foot to Alford's mobile home. As they walked to the trailer park, they discussed their response

if they were questioned by police. Upon arrival at the mobile home, the appellant and Wilson went into the bathroom and rummaged through Vestal's wallet. They discovered five dollars ($5) in cash, which the appellant took and later used to purchase cigarettes. The appellant cut Vestal's driver's license into two pieces. He and Wilson went outside and sprayed hair mousse on the wallet in an attempt to make the wallet flammable. When the wallet would not burn, the appellant threw it into the creek behind the trailer park. The next morning, the appellant and Wilson returned to the creek, located the wallet, and buried it. The appellant concluded his statement by maintaining, "I am sorry this happened. I only meant to take the guy['s] money and kick his ass."

Detective Thomas recalled that on the night of April 5, 1999, after obtaining statements from the appellant and Wilson, he went to the mobile home of Brandon Alford, where the appellant had been staying. Behind the mobile home, Detective Thomas discovered Vestal's wallet and its damaged contents.

Subsequently, Wilson's clothes, knife, and knife sheath were sent to a laboratory for testing. A sample of Vestal's blood was also analyzed. The results revealed that Vestal's blood was on all of Wilson's items that were sent for testing.

Following Detective Thomas' testimony, the State next called Brandon Alford. Alford largely corroborated the appellant's statement. According to Alford, the appellant spent the night of April 3, 1999, with him. The next morning, on April 4, 1999, Wilson came to Alford's mobile home. The three men began drinking. Around 6:30 p.m., Alford's girlfriend Susan "Sissy" Lingerfelt drove the trio to Big Creek. Lingerfelt was supposed to pick the men up one and one-half hours later but she never returned. The men passed the time by drinking beer and malt liquor and by smoking marijuana. Wilson "gigged" frogs with his pocket knife and the men cooked frog legs over a fire.

At approximately 1:30 a.m. on April 5, 1999, Vestal and Bolling came by in a white Toyota Celica. The three men obtained a ride with Vestal and Bolling. Alford noted that both Wilson and Vestal were intoxicated. As a result of his intoxication, Vestal was "driving sort of crazy" and "ran us up on the side of a bridge." The three men became agitated with Vestal's driving and threatened to "beat his ass if he didn't slow down and drive safely."

The group drove to Lakeview Marina where Wilson wanted to steal a boat. However, the rest of the group dissuaded Wilson from the theft. At the marina, the group smoked some marijuana. They left the marina and drove to the Bay Station convenience store. Bolling left the car to use the rest room and Vestal went inside the store, ostensibly to pay for gas. Alford heard the appellant and Wilson "talking back and forth about taking [Vestal] to Steele's Creek and beating his ass and taking his wallet." Bolling and Vestal returned to the vehicle. Vestal had not purchased gas, but had purchased a soft drink for Bolling, cigarettes, oil, and beer. The appellant told Vestal and Bolling that he had some marijuana hidden at Steele's Creek Park and he would give them "half a nickle" if they would drive him there. Alford explained that "half a nickle is five grams of marijuana." Alford requested that Vestal and Bolling drop him off at the trailer park. They complied

-4-

and Alford arrived back at his mobile home around 2:30 a.m. The appellant came to Alford's mobile home later that night. Alford, who had been sleeping, let the appellant in and then went back to sleep.

A little before noon on April 5, 1999, Dr. Mona Gretel Case Harlan, a forensic pathologist at East Tennessee State University and member of the Medical Examiner's office, went to the crime scene. Dr. Harlan noticed a trail of blood, a large blood spatter, and additional blood and scuff marks. Vestal's body was "sort of in the water but it was also on top of rocks because it was very shallow there." Vestal's shirt and the upper portion of his pants were covered with "red blood-soak." Dr. Harlan maintained that there was no evidence of drowning; "in fact, the clothing was not wet on the front."

Dr. Harlan performed the autopsy on the victim at 8:30 p.m. that night. She noted that Vestal had a blood alcohol content of .233 percent and his urine showed the presence of cannabinoids, the active ingredient in marijuana. Dr. Harlan discovered seven stab or slice-type wounds on Vestal's body where the skin was actually penetrated. The stab wounds were consistent with knife wounds, with one wound on Vestal's buttocks clearly showing that the weapon was a single-edge blade. Dr. Harlan opined that the two wounds on Vestal's face would have produced blood droplets consistent with those discovered on the pathway at Steele's Creek Park. Only one wound was fatal.

Dr. Harlan described the fatal injury as a "double stab wound," which "could be caused from either the knife going in, back out completely and back in again, or even more likely because it's behind the collarbone going in and coming part way out and then at a different ang[le] going back in." Furthermore, the wound was

> particularly fatal, lethal, because not only had it punched a small, two
> small holes in the top of the left lung that then caused air leakage
> from the lung, it also along its path, cut a very small artery . . . [that]
> would have formed a little spurt-er deep down in that wound that then
> managed to . . . fill up the left chest and also fill up the wound.

Dr. Harlan noted that the puncture wounds to Vestal's left lung and the pressure caused by the blood within his chest would have made breathing difficult. Additionally, Vestal's left chest contained more than a liter of blood, indicating that he bled for a considerable amount of time. Specifically, Dr. Harlan opined that Vestal could have lived as few as seven minutes or as many as thirty minutes, "depending on his heart's response." In sum, due to the stab wound, Vestal bled to death.

At the conclusion of Dr. Harlan's testimony, the State rested its case. The appellant moved for judgments of acquittal, which motions the trial court denied. As the first defense witness, the appellant called Daniel Wade Wilson. However, Wilson asserted his right against self-

incrimination because his own case was pending in the appellate courts.[3] The trial court declared the witness unavailable and allowed the appellant to read into the record Wilson's sworn testimony from his own trial.

In his previous testimony, Wilson asserted that he met the appellant and Vestal for the first time on April 4, 1999. Wilson stated that Lingerfelt left him, the appellant, and Alford at Big Creek that evening and did not return. When Bolling and Vestal showed up at Big Creek, the three men obtained a ride away from the creek. Vestal was driving "real reckless and out of control" and ran the vehicle off a bridge. The men pushed the car back on the road. Because of his erratic driving, the passengers became annoyed with Vestal. Wilson claimed that he had "a buzz" during the trip because he had been drinking and smoking marijuana. He asserted that the appellant and Vestal "had got in an argument for some reason," and the appellant threatened to "kick his ass" if Vestal's driving did not improve. Near Troublesome Hollow Road, Bolling pulled the keys from the ignition of the vehicle and she began driving. The appellant told Alford and Wilson, "We ought to beat this guy up and gank him or take his money" because Vestal was acting "red neck." Wilson alleged that he did not believe the appellant's proposal to be serious.

The group proceeded to the boat dock where they smoked marijuana using Wilson's "Sneak-a-Toke." When Wilson mentioned that he would like to have more marijuana, the appellant said that he could get marijuana from a guy in Steele's Creek Park. Wilson offered to purchase gasoline for Bolling and Vestal if they would drive them to get the marijuana. Accordingly, they drove to the Bay Station in Bristol and Wilson gave Vestal ten dollars ($10) to pay for the gasoline. While Vestal was in the store, the appellant began flirting with Bolling and asked her how much money Vestal was carrying.

Alford got out at the trailer park and the remaining four people proceeded to Steele's Creek Park. Bolling waited in the vehicle while the appellant led Wilson and Vestal into the park. The appellant claimed he was looking for marijuana that he had hidden in the park. Wilson maintained that Vestal turned to him and asked if Wilson believed that Vestal was "weak or stupid" or "a punk." Wilson responded that he did not. Vestal said, "I'll show you what kind of man I am," and hit Wilson in the face with a beer bottle. Wilson stated that he tried several times to get away from Vestal, but Vestal repeatedly struck Wilson, frequently attacking Wilson from behind. Wilson believed it was a "life threatening situation"; therefore, when he remembered he had a knife, he "didn't hesitate." He pulled out his knife and began randomly stabbing over his shoulder at Vestal. Wilson wondered where the appellant was and why he was not coming to his aid. Eventually, Vestal fell to the ground. While Vestal lay on the ground, groaning, the appellant turned him over and searched Vestal's pockets until he found and took Vestal's wallet. Wilson began walking away while the appellant rolled Vestal toward the creek. Wilson asserted that he never planned to rob anyone.

---

[3] See State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 587 (Knoxville, Aug. 2, 2001), perm. to appeal denied, (Tenn. 2002).

Wilson maintained that the two men left the park and walked to Alford's mobile home. Wilson washed the blood from himself in Alford's kitchen sink. The appellant went to the bathroom and came out with Vestal's wallet which had been covered in hair mousse. Wilson then followed the appellant outside and watched as the appellant attempted to burn the wallet. When the wallet failed to burn, the appellant threw it in the creek and Wilson covered the wallet with rocks. Wilson admitted that he had heard the appellant say that "he was planning to gank the guy." He explained that "gank" meant to "[t]ake his wallet or rip him off on some weed or such. That's what he said. That was his words he used. He said he was going to gank the guy." Wilson again noted that he did not believe the appellant intended to follow through with the threats.

Wilson conceded that only the front of his shirt was covered in blood. He also acknowledged that the photograph taken of him after the incident revealed no facial injuries despite his claim of being struck in the face with a beer bottle. Moreover, Wilson admitted that he attempted to conceal evidence of the crime, namely his clothes and the wallet.

After Wilson's testimony was read into the record, the defense rested and the appellant renewed his motions for judgments of acquittal. The trial court again denied the motions. On count one, first degree premeditated murder, the jury found the appellant guilty of second degree murder; on count two, he was found guilty of the charged offense of felony murder; and on count three, he was convicted of the charged offense of especially aggravated robbery. After a sentencing hearing, the jury imposed a sentence of life imprisonment for the felony murder conviction. The trial court merged the appellant's second degree murder conviction into his felony murder conviction. Additionally, the trial court imposed a sentence of twenty-five years incarceration for the especially aggravated robbery conviction. The sentences were to be served concurrently with each other but consecutively to an outstanding sentence in Virginia. On appeal, the appellant contests the sufficiency of the evidence and the jury charge.

## II. Analysis
### A. Sufficiency of the Evidence

We will first address the appellant's challenge to the sufficiency of the evidence supporting his convictions for felony murder and especially aggravated robbery.[4] In order to successfully challenge the sufficiency of the evidence supporting his convictions, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

---

[4] The appellant does not contest the sufficiency of the evidence supporting his second degree murder conviction which was merged into his felony murder conviction.

In order to sustain the appellant's conviction for felony murder, the State was required to prove that the appellant killed Vestal in the perpetration of a robbery. Tenn. Code Ann. § 39-13-202(a)(2) (1997). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2) (1997).

Additionally, we note that "intent to kill is not required under the felony murder statute[; however], the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 Tenn. Crim. App. LEXIS 92, at *16 (Nashville, Feb. 13, 1996). In other words, a conviction of felony murder in the first degree requires only a showing of a killing during the perpetration of an underlying felony and does not require premeditation or intent to kill. Tenn. Code Ann. § 39-13-202(a)(2).

Moreover, the trial court charged the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (1997). Tennessee Code Annotated section 39-11-402(2) (1997) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

The proof in the record revealed that during the evening of April 4, 1999, the appellant and Wilson discussed "ganking" Vestal; in other words, they planned to beat Vestal and take his money. See State v. Ricky T. Hughes, No. M2000-01846-CCA-MR3-CD, 2002 Tenn. Crim. App. LEXIS 458, at *14 (Nashville, May 21, 2002), perm. to appeal denied, (Tenn. 2002). The appellant led Vestal and Wilson into Steele's Creek Park. While the version of events as related by Wilson and the appellant vary slightly, both versions aver that Wilson repeatedly stabbed Vestal and the appellant took Vestal's wallet. See State v. John Charles Johnson, No. M2000-00529-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 193, at *38 (Nashville, Mar. 1, 2001), perm. to appeal denied, (Tenn. 2001). Vestal suffered seven stab wounds, the most serious of which resulted in Vestal bleeding to death. Accordingly, there is sufficient evidence to support the appellant's conviction for especially aggravated robbery. See State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 587, at **49-50 (Knoxville, Aug. 2, 2001), perm. to appeal denied, (Tenn. 2002). Moreover, because the evidence clearly demonstrates that Vestal died as a result of the stab wounds inflicted during the robbery, there is also sufficient evidence to support the appellant's conviction for felony murder. This issue is without merit.

## A. Lesser-Included Offenses

The appellant also raises several issues regarding lesser-included offenses. We note that a trial court's decision regarding whether a lesser-included offense should be submitted to the jury is a mixed question of law and fact; accordingly, we will review this decision de novo with no presumption of correctness. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001). Tennessee Code Annotated section 40-18-110(a) (1997) mandates that a trial court must charge the jury as to the law of each offense which is "included" in an indictment, namely the charged offense and any lesser-included offenses, regardless of a defendant's request for such an instruction. "In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), outlines the test for determining when an offense may be considered a lesser-included offense of an indicted offense.

## 1. Facilitation of Felony Murder

First, the appellant contends that, on count two, the jury should have been instructed on the lesser-included offense of facilitation of felony murder. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). Moreover, in State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998), this court noted that

> knowledge of the specific felony required under Tennessee Code Annotated section 39-11-403 is met in a felony murder prosecution not by knowledge of the felony murder, but by the knowledge that the other person was going to commit the underlying felony. In the case *sub judice,* the Defendant could be guilty of facilitation of felony murder because he knew his co-defendant was planning on committing a robbery, which is the underlying felony of the felony murder.

Burns specifically designates facilitation of the charged offense as a lesser-included offense. 6 S.W.3d at 467. Additionally, our supreme court has acknowledged that facilitation of felony murder is a lesser-included offense of felony murder. State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001), cert. denied, 534 U.S. 979, 122 S. Ct. 408 (2001). Further, in State v. Locke, 90 S.W.3d 663, 672 (Tenn. 2002), our supreme court explained that

> [f]acilitation, however, unlike lesser degrees of homicide is not an immediately lesser offense of felony murder under part (b) of the Burns test. In fact, facilitation is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another.

Accordingly, we must now determine whether the evidence supports an instruction on facilitation of felony murder.

A trial court is not required to charge on an offense simply because it is a lesser-included offense of the charged offense. "Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge." Burns, 6 S.W.3d at 468. Furthermore, if the instruction is warranted by the evidence, the trial court must instruct the jury on all lesser-included offenses regardless of any theory proposed by either the defense or the State. Richmond, 90 S.W.3d at 660. In determining whether the lesser-included offense should be charged, "the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Burns, 6 S.W.3d at 469.

In the instant case, the trial court conferred with counsel prior to determining which lesser-included offenses should be charged. The court agreed to charge the jury on felony murder and the lesser-included offenses of second degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide. The trial court carefully considered the issue, reviewed the evidence, and set out its reasoning for concluding that facilitation of felony murder should not be charged. Specifically, the trial court observed:

> The jury instructions, I'd ask you to look through them and see if you have any objections right now. One thing I have included for the moment, facilitation of [felony murder] which requires that they find that he have no interest in the proceeds. . . . And I don't know from the proof if there is any evidence that they could find that at all.
> . . . .
> All the testimony is [the appellant is] the one that took the wallet and after he hit the man, according to his statement, he took the wallet. According to the other person's testimony, Mr. Wilson's, is once the man was stabbed [the appellant] took his wallet.
> . . . .
> So I mean it's always been, all the testimony is consistent. . . . It's the [appellant's] idea and it's the [appellant] that took the wallet.

We agree with the trial court.

In the instant case, the proof that the appellant intended to rob Vestal is overwhelming and undisputed. In his two statements to police, the appellant alleged that he never meant to kill Vestal; however, the appellant repeatedly stated that he intended to, and did, rob Vestal. As we earlier noted, a conviction of felony murder in the first degree requires only a showing of a killing in the perpetration of an underlying felony and does not require premeditation and intent to kill. Tenn. Code Ann. § 39-13-202(a)(2).

Specifically, in his handwritten statement, the appellant admitted that he, Alford, and Wilson "talked about ganking" Vestal, explaining "that we were gonna jump him [and] kick his ass." In his typewritten statement, the appellant related that "[w]e were going to kick the guy['s] ass and

take his money. . . . It was my idea but we all talked about it." The appellant maintained that he took Vestal's wallet and Wilson proceeded to kill Vestal. Nonetheless, the appellant conceded that after the murder, he and Wilson threw Vestal's body into the lake. Additionally, Alford testified that the appellant and Wilson had planned the robbery earlier in the evening. Wilson's testimony also confirmed that the appellant repeatedly stated his intent to rob Vestal. According to Wilson, the appellant took Vestal's wallet while Vestal was lying on the ground, dying. After removing the wallet, the appellant rolled Vestal's body into the lake. As we earlier noted, the proof was uncontroverted that the appellant planned and executed the robbery. As instructed in Ely, we have applied the Burns analysis to determine whether facilitation of felony murder should have been charged. Accordingly, we have concluded that the facts do not encompass a theory of facilitation. Therefore, no instruction on facilitation was warranted. We further conclude that no reasonable juror could have believed that although the appellant was present, knew that Wilson intended to commit a robbery, and furnished substantial assistance in the commission of the robbery, he nevertheless did not intend "'to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" Ely, 48 S.W.3d at 724.

Regardless, any error was harmless. Our supreme court noted in Allen that a trial court's failure to instruct on a lesser-included offense is harmless beyond a reasonable doubt when the "omitted element was uncontested and supported by overwhelming and uncontroverted evidence." 69 S.W.3d at 189. Additionally, on count one, the jury had the opportunity to consider the lesser-included offense of facilitation of first degree premeditated murder, yet rejected that theory of guilt by convicting the appellant of second degree murder. Cf. Locke, 90 S.W.3d 663, 673 (Tenn. 2002). Accordingly, even if the failure to charge the jury on facilitation of felony murder were error, in light of the overwhelming proof of the appellant's participation in the planning and execution of the crimes, such error was harmless beyond a reasonable doubt. Tenn. R. Crim. P. 52(a); Richmond, 90 S.W.3d at 661.

### 2. Facilitation of Robbery Offenses

The appellant also complains that, as to count three, which count resulted in the appellant's especially aggravated robbery conviction, the trial court erred in failing to instruct the jury on the lesser-included offenses of facilitation of especially aggravated robbery, facilitation of aggravated robbery, and facilitation of robbery. On count three, the jury was instructed to consider the appellant's guilt of the charged offense of especially aggravated robbery and the lesser-included offenses of aggravated robbery and robbery. This issue is likewise without merit.

Again, we note that Burns specifically provides that an offense is lesser-included if it is "facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense." 6 S.W.3d at 467. Aggravated robbery and robbery are lesser-included offenses of especially aggravated robbery. Locke, 90 S.W.3d at 673. Thus, facilitation of especially aggravated robbery is a lesser-included offense of especially aggravated robbery, facilitation of aggravated robbery is a lesser-included offense of aggravated robbery, and facilitation of robbery is a lesser-included offense of robbery. See Allen, 69 S.W.3d at 187. However, as we earlier noted, the evidence adduced at trial does not support a charge of facilitation of any of the robbery offenses.

There is no indication in the record that the appellant did not act with the intent to promote or assist the commission of the robbery or to benefit in the proceeds or results of the robbery. To the contrary, the appellant admitted that it was his idea to commit the robbery and that he was the one who took Vestal's wallet. There was no "scintilla of proof" that the appellant did not fully participate in the robbery of the victim. See State v. Sammie Netters, No. W2001-02710-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 23, at *19 (Jackson, Jan. 8, 2003), application for perm. to appeal filed, (Feb. 18, 2003). Regardless, any error in failing to charge the jury on any facilitation offenses on count three is harmless beyond a reasonable doubt. Tenn. R. Crim. P. 52(a); Richmond, 90 S.W.3d at 661.

### 3. Accessory After the Fact

The appellant also contends that on each count, the trial court should have instructed the jury on the lesser-included offense of accessory after the fact. This court has previously held that, traditionally, "[t]he offense of accessory after the fact is a separate and distinct crime from that of a principal." State v. Hoosier, 631 S.W.2d 474, 476 (Tenn. Crim. App. 1982); see also State v. Hodgkinson, 778 S.W.2d 54, 63 (Tenn. Crim. App. 1989). Reviewing this issue under the Burns analysis, this court has repeatedly "concluded that the traditional view remains unchanged under Burns." State v. Joel M. Puentes, No. M2001-01115-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 92, at *12 (Nashville, Feb. 1, 2002); see also State v. Jon Robert Goodale, No. M2000-02140-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 745, at *15 (Nashville, Sept. 14, 2001), perm. to appeal denied, (Tenn. 2002). Accordingly, since the appellant was not charged separately with the offense of accessory after the fact, the trial court did not err in failing to instruct the jury on that offense. State v. Asata Lowe, No. E2000-01591-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 783, at **52-53 (Knoxville, Sept. 16, 2002), perm. to appeal denied, (Tenn. 2003). This issue is without merit.

### 4. Reading of the Charge

Finally, the appellant argues that "the Court failed to define and/or to instruct the jury as to the definition and order in which to consider lesser included offenses of [felony murder]." At trial, the trial court began its instructions by informing the jury:

> In addition to the offenses charged you will be instructed as to any lesser offenses which may be included by operation of law and the offenses charged. In this case in each count if you find the defendant not guilty of the offense charged then you shall consider lesser included offenses in the order in which they are listed. If you find the defendant guilty of the offense charged then you would not consider any lesser included offense. You may, of course, find the defendant not guilty of all offenses in all counts and you should so find if you have a reasonable doubt thereof.
>
> . . . .
>
> In Count [one] of this case you are trying ten charges against the defendant. Premeditated first degree murder, facilitation of premeditated first degree murder, second degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of

voluntary manslaughter, reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide. You can find the defendant guilty of only one offense in Count [one], however you may find the defendant not guilty of all offenses stated and included in this count and you should so find if you have a reasonable doubt thereof.

In Count [two] of this case you're trying nine charges against the defendant, first degree murder in the perpetration of robbery [i.e., felony murder], second degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide. You can find the defendant guilty of only one offense in Count [two], however you may find the defendant not guilty of all offenses stated and included in this Count and you should so find if you have a reasonable doubt thereof.

The trial court then explicitly detailed the order in which the offenses were to be considered in counts one, two, and three. Specifically, on count two, the trial court advised the jury that they must first determine the appellant's guilt of felony murder; if the jury had reasonable doubt as to his guilt on that offense, the jury should then proceed to determine his guilt of second degree murder. If the defendant was found not guilty of second degree murder, then the jury should determine the appellant's guilt of facilitation of second degree murder. The trial court instructed the jury as to all of the previously mentioned lesser-included offenses of felony murder.

The trial court then proceeded to define all of the previously mentioned offenses and did so in the following order: premeditated first degree murder; facilitation of premeditated first degree murder; second degree murder; facilitation of second degree murder; voluntary manslaughter, facilitation of voluntary manslaughter; reckless homicide; facilitation of reckless homicide; criminally negligent homicide; facilitation of criminally negligent homicide; felony murder; especially aggravated robbery; aggravated robbery; robbery; and theft under five hundred dollars ($500).

The appellant essentially complains that the trial court did not reread the definitions for second degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide after reading the definition of felony murder. However, in light of the trial court's extensive jury instructions regarding the consideration of lesser-included offenses, we conclude that the trial court did not err in defining the offenses or in instructing the jury as to the order in which to consider the lesser-included offenses. "It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court."

Williams, 977 S.W.2d at 106.  This issue is without merit.

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____

NORMA McGEE OGLE, JUDGE